MARY IBA, Respondent, v. CHICAGO, BURLING-
TON & QUINCY RAILROAD COMPANY, and
THOMAS O. PHELAN, Appellants.

Kansas City Court of Appeals, January 11, 1915.

1. **NEGLIGENCE: Railroads: Death: Boarding Trains.** The plaintiff, widow of Frederick Iba, deceased, sued to recover damages from the defendants for the death of her husband. The deceased attempted to board a train for which had purchased a ticket. He succeeded in placing one foot on the lowest step of the car and had a hold of the hand railing, when the conductor pulled on him, and he hit against a freight truck standing close, lost his hold, fell under the car, and was killed. *Held,* that there was no reversible error in the record and the judgment for $5000 will be affirmed.

2. ——— : ——— : ———. Where one starts to board a train, for which he has purchased a ticket, and before it is signalled to start, he is acting within the scope of his rights as invitee, and the conductor has no right to eject him, especially after the train starts. When such ejection is the proximate cause of his death or injury, the conductor is liable to respond in damages and also the railroad company because of its responsibility for his act under the rule of respondeat superior.

Appeal from Buchanan Circuit Court.—*Hon. Wm. D. Rusk*, Judge.

AFFIRMED.

Culver, *Phillip & Spencer* and O. M. *Spencer* for appellants.

(1) The Supreme Court has superintending control over the Kansas City Court of Appeals where it has acted beyond or in excess of its power and jurisdiction. State ex rel. v. Broaddus, 245 Mo. 123. (2) An appellate court in this State is limited to the errors assigned in motion for new trial filed within the time allowed by law and an attempt of an appellate court to investigate a question suggested otherwise is beyond its power and jurisdiction. Revised Statutes 1909, sec. 2081; King v. Gilson, 206 Mo. 264, 280; Rodan v. Transit Co., 207 Mo. 392, 406; Winn v. Grier, 217 Mo. 461; St. Louis v. Lawton, 189 Mo. 474; Williams v. Railroad, 156 Mo. App. 675; Fussellman v. Railroad, 139 Mo. App. 198; Brenton v. Thomas, 138 Mo. App. 64; Stauffer v. Railroad, 243 Mo. 305; Ewart v. Peniston, 233 Mo. 695; Sterrett v. Railroad, 225 Mo. 99; Street v. School District, 221 Mo. 633; Lynch v. Railroad, 208 Mo. 42; Bank v. Porter, 148 Mo. 176.

*C. C. Crow* and *John S. Boyer* for respondent.

JOHNSON, J.—Plaintiff, the widow of Frederick Iba, deceased, brought suit in the circuit court of Buch-

anan county, December 14, 1909, against the defendant railroad company and Thomas Phelan to recover damages for the death of her husband which she alleges was caused by the joint negligence of the defendants. Iba was killed October 13, 1909, at the station of Easton, while in the act of boarding a passenger train as a passenger. Plaintiff alleges "that her said husband, Frederick B. Iba, had boarded the said train and was standing upon the steps of the passenger coach of said train, holding with his hand to the handrail of said coach. That at said time the defendant Thomas Phelan, conductor of said train, was standing on the depot platform at said place and had caused the said train to begin to move and that while plaintiff's said husband was standing on the lower step of the said passenger coach, the conductor called up to him in a loud voice to get off the train, and moved toward this plaintiff's said husband and took hold of him and pulled him backward so as to cause his body to sway backward off of the steps of the said coach and that the said conductor pulled this plaintiff's husband backward from the said train and interfered with, and prevented this plaintiff's said husband from going up the steps of the said coach and inside of the said train, by his words and acts aforesaid. That the said defendant Thomas Phelan, conductor of said train, also pushed this plaintiff's said husband forward into the steps of said train and caused his body to sway forward and then backward, while the plaintiff's said husband was in the position aforesaid. That immediately thereafter the said defendant, Thomas Phelan, conductor of said train, and agent, servant and employee of defendant as above stated, pulled this plaintiff's husband backward and forward as above stated and caused his body to sway forward and backward while in the position above stated; that the body of this plaintiff's said husband struck one end of the large freight truck above mentioned, while standing in the place and position

above described, and that by striking the end of the said truck the body of this plaintiff's said husband was again knocked forward and caused to sway and strike the said truck again, and thereby and on account of the actions of the said conductor, and the defendant, Chicago, Burlington & Quincy Railroad Company, and on account of their joint carelessness and negligence as herein specifically stated and detailed, this plaintiff's said husband was caused to lose his balance upon the steps of the said train between the said depot platform and the said train, upon the ground and under the wheels of said train, where this plaintiff's said husband was dragged and crushed under the wheels of the said train, and on said railroad tracks, from which he instantly died.''

The defendant railroad company filed a petition and bond to remove the case to the United States court on the ground that said defendant was an Illinois corporation; that plaintiff and Phelan were citizens of Missouri and that the cause of action pleaded in the petition being founded on section 2864, Revised Statutes 1899 (5425, R. S. 1909) was separable and not joint. The circuit court approved the bond and made an order transferring the cause, but the Supreme Court reviewed this ruling on *certiorari,* and quashed the order on the ground that the petition stated ''but one cause of action and that is against both defendants and it is under sections 2865 and 2866, Revised Statutes 1899, now sections 5426 and 5427, Revised Statutes 1909.'' [State ex rel. v. Mosman, 231 Mo. 474.] Pursuant to this decision the circuit court of Buchanan county resumed jurisdiction over the cause and tried it in February, 1911, upon the issues raised by the petition and answers and the jury returned a verdict for plaintiff assessing her damages at $5000.

In due time defendants filed their motion for a new trial and at the same term but after the time had

expired for filing a statutory motion for a new trial, defendants filed a paper called ''a suggestion to the court'' in which they alleged that Albert Rise, a witness introduced by plaintiff, had given perjured testimony, and invoked the exercise of the inherent power of the court to remedy the injustice perpetrated by such means. At about the same time a criminal proceeding was instituted by the State against Rise on a charge of perjury. The circuit court did not dispose of the motion for a new trial until after the trial of the criminal case which ended in the acquittal of the accused. A new trial then was refused and in passing on the suggestions addressed by defendants to the judicial conscience, the court made a statement of its views which was taken down by the stenographer and afterward preserved in the record. These views were of a nature to raise a serious question concerning the propriety of the court's ruling. Defendants appealed to this court and presented for our decision the following questions:

First: ''The order removing this cause to the Federal court not having been set aside by the trial court, it had no jurisdiction to try the case.''

Second: ''The petition and bond for removal of the defendant railroad company being in form and the case being removable, the trial court lost jurisdiction when said petition and bond were filed.''

Third: ''Defendants' demurrers at the close of all the testimony should have been given.''

Fourth: ''The court committed error in instructing the jury that 'defendant company, its agents, servants, and employees, owed deceased the highest degree of care such as would be exercised by practical and skillful railroad employees under like circumstances.' ''

Fifth: ''The court should have granted the defendants a new trial because of perjury committed by plaintiff's witness Albert Rise.''

We found the fifth question difficult to solve but at last held that a new trial should have been granted on the ground that since it appeared in the record that the trial court was convinced of the perjury of Rise and that the verdict was against the weight of the evidence, its refusal to give defendants a new trial out of deference to the finding of the jury in the criminal case was an error which should be reviewed and corrected on appeal. We refer to the report of that decision for a full statement of the case and the reasons which led to our final conclusion that reversible error had been committed. [Iba v. Railroad, 172 Mo. App. 141.]

Further we held that the decision of the Supreme Court on the issue of the removal of the cause to the Federal court was final and conclusive and that "it was not necessary for the trial court to first set aside its removal order before trying the case since the Supreme Court had effectually disposed of it." We are bound to follow the decision of the Supreme Court that the cause pleaded in the petition is under sections 5426 and 5427, Revised Statutes 1909, is, therefore, joint and that no ground exists for removal (See also Railway v. Schwyhart, 227 U. S. 184, affirming Schwyhart v. Barrett, 145 Mo. App. 332), and shall not again refer to the first two assignments of error. We did not discuss the demurrer to the evidence and the alleged error in plaintiff's first instruction, for the reason that while they were not formally abandoned, they were treated by both parties as negligible questions, and the issue of Rise's alleged perjury and the trial court's treatment of it became the sole subject of argumentative controversy between the parties.

Following the announcement of our decision the Supreme Court, at the relation of plaintiff, reviewed the case on *certiorari* and held, in substance, that the trial court's ruling on the weight of the evidence, under the facts disclosed, was not reversible error. Reference to that opinion, which is reported in Vol. 256 of the

Missouri Reports at page 644, will disclose the reasons
for the decision that our opinion was in conflict with
prior cases of the Supreme Court and that the judg-
ment based thereon should be set aside.  The command
was that the judgment rendered in this court "be
quashed and for naught held and that said cause should
be remanded to that court to be retried by it and de-
termined in conformity with the views announced
herein."

The opinion of the Supreme Court does not refer
to any other assignment of error than that relating to
the ruling on the weight of the evidence, and we sanc-
tion the contention of defendants that the mandate re-
quires us to hear the cause on the questions of the suf-
ficiency of the evidence of plaintiff to take the case to
the jury and of the alleged error in the first instruction
given at the request of plaintiff.

Facts pertinent to the proper consideration of these
points thus may be stated:  Iba, who was sixty-eight
years old, was actively engaged in the grain and stock
shipping business at the town of Easton, twelve miles
east of St. Joseph, on defendant's railroad.  He was
intemperate in the use of intoxicants but at the time in
question was not noticeably under the influence of
liquor.  He intended going to St. Joseph that afternoon
on the passenger train and bought a ticket which enti-
tled him to become a passenger thereon.  The train
stopped, as usual, at the station platform for the re-
ception and discharge of passengers and there is no
suggestion in the evidence that it did not remain sta-
tionary a reasonable time for the safe egress and in-
gress of outgoing and incoming passengers.  Iba had
other business at the station and did not attempt to
board the train until just before or just after it started
to leave.  Plaintiff introduced two witnesses, one of
whom was the witness Rise, who testified that just be-
fore the conductor Phelan, who was on the platform,
gave the signal to start the train, Iba stepped to the

bottom step of the front entrance of the rear coach and, holding with his left had to a handhold, paused an instant to respond to a question or salutation, when the train started and the conductor commanded him to alight and then forcibly tried to pull him from the step. There was a loaded truck standing on the platform close to the train, a short distance ahead and the struggle between the conductor and Iba lasted until the former, who was still on the platform, was compelled to desist in order to escape collision with the truck. Iba remained on the step clinging to the handhold, but his body protruded outward far enough to collide with the truck and he was thrown off the step and killed.

The testimony of these two witnesses is corroborated in every detail (with a single exception) by the first two witnesses introduced by defendants. The only substantial difference between these witnesses is that those for defendants state that Iba did not start to board the train until after it had started forward We quote from the testimony of H. B. Martin, one of defendant's witnesses:

"I could not see the conductor, but I heard him make the remark, 'all aboard,' and the train moved out and Iba could see the coach from looking out of the freight house door, and as quick as he saw the coach move off he come out. I could not say that he run, but it was the next thing to it, when he got to the door he kind of cut angling across to catch up with the train, with the car, and when he caught up with the coach, why he reached out with his left hand, and grabbed what you call the handhold with his left hand, and he managed to get up with his left foot on the lower step; I don't know whether you might call it an awkward position or not, but he was hanging there all right enough.

"Q. While you are on that will you describe his position to the jury, how he was hanging, you say he

was hanging there? A. He was hold of the handle bar, I suppose everybody knows how it is to catch hold of a train when it is moving that way, it is mighty hard to balance yourself.

"Q. Where was his feet? A. His left foot was on the lower step of the steps.

"Q. Where was his other foot? A. It was hanging down between the steps and the platform.

"Q. Could you tell what, if anything he was trying to do? A. I suppose he was trying to get on the train, of course.

"Q. Now go ahead and tell what happened. A. Well, after he was on there, the conductor happened to notice it, I suppose, and the conductor was standing between him and the truck that was on the platform there, he was—   . . .

"Q. State what you did see. A. I saw, as quick as the conductor saw him, he turned around and approached, run over to Mr. Iba and when he got within a reasonable distance, or reaching distance, he just made him, and said to him he says, 'what are you doing on there.' He says, 'get off,' and told him to get off and the second time he hollered to get off, and he grabbed hold of his right arm, and looked like he was trying to pull Mr. Iba off, for what object I don't know. Of course that was his business; he tried to pull him off all right. After that he could not get him off, and he got within two or three feet of the truck, and turned him loose and broke his hold some, why, after he got loose he made a move just like a man would if he was going to run against him or such as that, pushed him on the flat of his back, or on his side, to push him up the steps but whether or not he pushed him I could not tell. Had to look mighty fast to keep up with him, and the conductor jumped back and kept from hitting that truck, and as quick as the conductor jumped back Iba was coming into contact with that truck, and it hit him somewhere along in the side,

and when it hit him it jolted him back with his back against the side of the coach and swung his right arm around against the back of the coach, so you could hear distinctly the slap of the hand on the back of the coach, and when he swung back again so he come—come back again he had passed the truck two-thirds of the distance and when he come around again he just hit it kind of a glancing lick.

"  .  .  . tell the jury what his position was when the conductor started towards him. A. I could not call it a dangerous position so far as that was concerned, but it was awkward.

"Q. You are not allowed to say that. Tell the jury what his position was. A. He was standing there hanging, ahold with his left hand to that rod and standing on the lower step with his left foot on that step, and the right foot hanging down by the side of it.

"Q. Can you tell whether he was aiming to get on or off the train? A. He was undoubtedly trying to get on the train. He was doing that all right.

"Q. How long was he in that position, trying to get on the train? A. I really could not say. I don't know how I could answer that because just in a moment everything was over. I think though he went about ten or twelve feet before the conductor noticed him, and as quick as the conductor noticed him he run towards him and told him—asked what he was doing up there, and told him to get off, twice, and the second time he told him, grabbed hold of him and tried to knock him off—tried to put him off, I mean.".

On cross-examination:

"Q. What was Mr. Iba doing when the conductor took hold of him? A. Why, he was on the—having hold of that handle bar, and standing on the lower step of the train.

"Q. Was he getting on the train? A. He was trying to, I suppose, yes.

"Q. The train was carrying his whole weight, wasn't it? A. Yes.

"Q. He did not have his right foot on the platform, did he? A. Not according—not the way I saw it.

"Q. And he was then riding on the train, wasn't he? A. Well, you might call it that.

"Q. Now how fast was that train going? A. Oh, about as fast as it generally goes when it leaves the depot. It did not go any faster than usual, or any slower, I don't suppose.

"Q. We don't know how fast that is. It was moving very slow, wasn't it, just starting up? A. Yes, sir.

"Q. And he was riding on it? A. Well, of course.

"Q. He was riding on it? A. Yes.

"Q. Then the conductor took hold of him? A. Yes, sir.

"Q. And tried to pull him, did he? A. Yes, sir; he tried to pull him off. . . .

"Q. He hung onto him? A. Yes, sir.

"Q. There would not have been any trouble if the conductor had not taken hold of him, and hung onto him? A. I hate to give my judgment on that, but I don't think there would be."

On re-direct:

"Q. At the time the conductor started towards Mr. Iba to take hold of him, what was Mr. Iba's position as to whether it was erect, up straight, or whether he was swinging? A. Well, you could not say he was swinging; he was standing with his left foot on the step, and having a firm hold on the—

"Q. What position was his body? A. Upright.

"Q. Perfectly straight? A. Yes, sir.

"Q. Where was his right foot? A. His right foot was hanging between the step and the platform; he was just standing on his left leg.

"Q. Standing on his left foot? A. Yes, sir.

"Q. With his right foot swinging? A. Yes, sir; swinging down betwixt the steps and the platform."

To the same effect is the testimony of W. R. Deakins, the other witness for defendant we have mentioned.

The conductor and other witnesses testified that Iba did not try to get on until after the train had started and that without succeeding in obtaining a foothold he was hopping along trying in vain to get on the step when, seeing his predicament, the conductor attempted to grab him and save him from falling between the platform and train. It will be noted that there are three evidentiary versions of the injury, viz., first, that Iba, intending to become a passenger, started to board the train while it was still standing at the station for passengers to get on, and that he had attained a position of safety on the step when the conductor assaulted him and forced him into a position of peril. Second, that he did not attempt to board the train until after it had started but succeeded in attaining a position of safety on the step when he was assaulted and thereby imperilled. And, third, that he did not try to board the train until it had acquired a dangerous speed, did not reach a position of safety and was not assaulted by the conductor whose effort towards him was put forth under the humane impulse of saving him from death or serious injury.

Each of these versions finds substantial support in the evidence and since none of them appears opposed to physical fact or law, it was for the jury to decide which group of witnesses should be believed. Under the first of these evidentiary hypotheses, there can be no question of the liability of defendants. By stopping its passenger train at the station for the reception of passengers, defendant company extended an implied invitation to Iba, who had provided himself with a ticket entitling him to ride on that train, to become a passenger thereon. That invitation continued

as long as the train stood there and until it was closed by the conductor's signal to start. If Iba, during that period, started to board it, he was acting within the scope of his rights as an invitee, and the conductor had no right to attempt to eject him, especially after the train had started. Clearly such wrong was the proximate cause of his death and the conductor is liable to respond in damages because he was the wrongdoer, and the railroad company because of its responsibility for his act under the rule of *respondeat superior.* The act did not consist of a negligent operation of the train. but of an unjustifiable attempt to eject a passenger from a moving train on which he had rightfully attained the status of a passenger. [State ex rel. v. Mosman, supra, l. c. 490, et seq.]

The liability of defendants seems no less clear and certain under the second hypothesis. Concede that the invitation had been closed and that it was negligence for Iba to attempt to board the train, such negligence was the remote, not the proximate cause of the injury. It was not a positive wrong for him to try to catch a moving train and if he succeeded and placed himself thereon in a position of relative safety, he was no outlaw nor wrongdoer, but became entitled to ride on the train, since he possessed a ticket which so qualified him; and, having reached the status of a passenger, defendant railroad and its servants owed him the highest degree of care to protect him from injury. Instead of giving him such protection the conductor tried to force him from the moving train and thereby converted his position of relative safety into one of the greatest danger. It is too plain for argument that such act was the proximate cause of the injury. The trial court could not well do otherwise than overrule the demurrer to the evidence, since plaintiff was entitled to go to the jury on either of the first two hypotheses.

We have said enough to show that there is no merit in the criticism of plaintiff's first instruction, since,

under the common law, a carrier is required to exercise the highest degree of care towards a passenger. The instruction is not in conflict with defendants' eighth instruction which is bottomed on the evidence of the conductor and negatives the idea that Iba had become a passenger. Until he became a passenger defendant railroad company and its servants would owe him no higher duty than that of reasonable care.

There is no reversible error in the record and the judgment will be affirmed. It is so ordered.

All concur.